The next case on for argument is Reyes v. Wenderlich and Farnham. Good morning, Your Honor, and may it please the Court. My name is John Ceretto for Appellant Earl Reyes. Mr. Reyes's conditions of confinement claim in this case is that he was made to suffer through the freezing cold temperatures of the upstate New York winter for several months, from October of 2013 to March of 2014, because there was no operable heat on the back half of the A-12 gallery at Southport Correctional Institution. The clearly established law that's relevant to this claim is both well-settled and highly specific. This Court has said on a number of occasions that it violates the Eighth Amendment to expose a defendant for a prolonged period of several months to the harsh conditions of the upstate New York winter. So what I'd like to do in my brief time today is to go over some of the facts in the record that we think show that summary judgment should not have been granted and that there ought to be a trial. First, that it was, in fact, freezing on the back half of the A-12 gallery all winter. This evidence starts with the National Oceanic and Atmospheric Administration's records that shows, unsurprisingly, around Elmira, New York, during this period, it was freezing. It was freezing all winter. And, indeed, the lowest temperatures were often right around the times where the most grievances and complaints were being submitted. Second, there is contemporaneous witness statements and also Mr. Reyes's declaration about what inmates were dealing with during this period. So Mr. Reyes says in his own declaration, the heat was not operable the whole time. I was suffering and shivering the entire winter. It doesn't end with Mr. Reyes, however, and this really runs through the entire period. So one grievance, just to take an example, this is at 117, I believe, of the appendix. And December says we're still suffering here. It's still freezing. And it goes on. Stacey Smallwood, who is in, this is really the evidence shows in the back half, so from about cell 15 back. Stacey Smallwood, I think, was in somewhere around 17. Stacey Smallwood was in February. No heat. The radiation and the pipes and the heaters are not working. We can't sleep back here. Correll Chambers, Correll Chambers came in in January and so had been, so was new to the experience, came in in January, said for the rest of the winter we were freezing without any heat at all on the back half of the company. It's clear that there are complaints about the heating throughout this period and that it is very cold at this time. Help me understand why there needs to be further inquiry into deliberate indifference, though, on this record, because there's also substantial evidence that they were doing things. Maybe they were ineffective, but Morgan testifies he's checking the computer daily. Physical checks are done once a week. The water heater is checked on a regular basis. So it's hard for me to see how there's a disputed issue here as to deliberate indifference. Sure. So what are the disputed issues? And you're right, there's maybe even a compelling story to tell on the other side, but the disputed evidence really starts with Mr. Reyes's declaration. Mr. Reyes says the way this happened was about in late October, defendants Wenderling and Farnham, the superintendent and the deputy superintendent, come down to the A12 gallery and the inmates complain the heat's not working. They say, well, we'll get someone to look into that. Five days later, Defendant Morgan comes down, and this is in Mr. Reyes's declaration. Defendant Morgan comes down, does some work, but says, you know, I really am going to need to get to the roof in order to deal with this problem, and I'm not going to be able to do that, certainly, until the weather gets warmer. That's Mr. Reyes's testimony in his declaration. And then it continues. So the testimony is that Farnham and Wenderling, they make rounds as part of their regular practices. They come through the A12 gallery where they would have experienced the freezing cold temperatures. And they say, we're still freezing down here, and, you know, a jury may believe it, a jury may not believe it, but the evidence is that Wenderling and Farnham say they joke, they laugh about it, they say, well, you know, you're just going to have to talk it out. It's cold up there. You don't really expect the people to go up there and fix the roof. And so that is the evidence of deliberate indifference. Now, I recognize there is another side of the story, and in about three and a half minutes you're probably going to hear all about it. So the other side of the story is that, no, Mr. Morgan says in his declaration that the roof, the issue on the roof, I never said anything about the roof being the problem, and the issue on the roof actually isn't related to the heat at all. So the jury is going to have to consider that evidence. They should have an opportunity to say, okay, well, I have these statements of complaints and grievances over and over again, nothing being done about the roof, and acknowledgments, evidentiary admissions by the defendants that it is the roof that's the problem. Is there an allegation that your client suffered physical effects, illnesses, flu? There are allegations that he was suffering, that he couldn't sleep, that he couldn't read, that the cold was so intense that he could not focus on life's activities. There is no evidence that it's true that they point out that there is a lack of evidence in his medical records of some physical manifestations. But you're saying it's true that they pointed out, but it's true, period, isn't it? Well, I couldn't say. Mr. Arreaz was pro se below. The medical evidence, and I think this is important. He made 20 complaints over this period of time, and none of them seemed to mention that he's freezing or can't sleep. Right. What I was going to say is that the medical evidence in the record relates to those serious complaints that he tried to raise on his denial of medical care. It's true that there's no evidence which was for a different claim and a different purpose that this Court has dismissed. But in cases like Corelli, Gaston, the cases we cite in our brief about the exposure to freezing cold temperatures, those cases do not require a physical manifestation. But in Corelli, in Corelli, the proof that the conditions were freezing is that the water in the toilet was freezing. Yes. There is testimony that the water in the toilet was freezing. That's in Corelli. Yes, exactly. Not in this case. No, not in this case. And I suppose that — You know, if it's freezing, water tends to freeze. There's no evidence on this record one way or another about the status of the water in the toilet serum. Well, don't you think that's telling? I don't. I don't. I don't think it's telling. If your client's all alone all day in the cell and the water's frozen, you'd think he would make a point of that. Perhaps he would. I don't know the status of the toilets at Southport and where they're located. But I do know that it's not just Mr. Reyes. It is inmate after inmate who says it's freezing there. And I don't think that that's something that the district court ought to have done on summary judgment or the inferences that this Court should be drawing up here on appeal. But just to finish up on the evidence. So where — before you finish up, where do we — where do we draw the line? What constitutes enough to get — I'll say it this way — before the jury? I mean, just one inmate complaining isn't enough, three inmates saying it's freezing? I mean, I have law clerks who come up to Rutland, Vermont, from down south, and they complain it's freezing. And for me, it's too darn hot. So there are credibility determinations to be made. What I'll say is that here we have multiple witnesses. And then on the other side, there are no — there was computerized electronic evidence that would have shown one way or another what the temperature was in this facility. It's not here, as Defendant Morgan acknowledges in his affidavit. Notwithstanding the fact that multiple grievances are being made, notwithstanding the fact that threats of litigation and claims of an Eighth Amendment violation are being levied over and over again, those records are not retained, they are not here, and they're not in the record. And I think a jury could draw a difference and say, well, that's pretty telling as to what the real state of the facts were. I see I'm out of time. Thank you. Roberts. You've reserved some time for rebuttal, Mr. Serrato. Ms. Levine. Good morning. May it please the Court, Alison Levine for Appellees. Plaintiff has focused on the issue of the temperatures on 812, but even if there was an issue of fact concerning the temperatures, which we do not concede, that is not dispositive. What is dispositive is that defendants adequately responded to plaintiff's complaints here and thus were not deliberately indifferent. Plaintiff himself admitted that he twice saw Morgan on the gallery with a handheld thermometer checking the temperatures. Defendants all affirmed that they never, as far as they were aware, the temperatures never fell below 67 degrees between October and March. Defendants also offered the detailed statement from Morgan explaining what he did that winter, and that included, as Your Honor stated, his monitoring on a daily basis of the computer and also his weekly monitoring of the thermometers on the walls of the gallery. Is that data marshaled somewhere? I'm glad you asked, Your Honor. In fact, the computer program or the computer system that logs the data, I'm advised by my client that it only retains the data for a relatively short period of time. He believed it was about 60 days. And so it, you know, it erases itself in seriatim as the 60 days wears on. So that's why the data is not available. But again, Your Honor, that information would have been probative as to the temperatures, not as to Morgan's monitoring of the temperatures. And the evidence here is clear that Morgan was consistently monitoring the temperatures. Yeah, but I mean, I think your adversary's point is, well, there's monitoring and then there's monitoring. He can go say, well, I'm monitoring it and it's 50 degrees and I'm not going to do anything about it, or I'm monitoring it and it's adequate, it's 67, and so everything's okay. Morgan's declaration specifically states that when he monitored it, as far as he knew, it never dipped below 67 degrees. But to your point, Your Honor, that is corroborated by contemporaneous evidence. It's corroborated by two contemporaneous work requests. On December 12th, in response to inmate complaints, Morgan went to A12 Gallery and he did close windows and then he measured the temperature in the gallery and determined that at the front of the gallery it was the same. Closed windows? There were windows that were open? He says that there were windows that were open, Your Honor. And again, I'm advised by my client that if the inmates ask the inmate porters to open the windows, sometimes they do. In response to if an inmate complains or is asthmatic or needs fresh air, they do. But Morgan closed the windows. He turned the heat up. He measured the heat at the front of the gallery. It was 70 degrees. Measured the heat at the back of the gallery. It was 67. And again, he returned in response to inmate complaints on March 6th and measured the heat and said that it was warm all through the back of the gallery back to the staircase. Can I ask that the plaintiff says that Morgan told him in one of the occasions in which there's a complaint made, we need to access the roof and we can't do that until the weather is warmer. And I take it Morgan says in his declaration that he wouldn't have said that because there's no need to access the roof. But one of these work orders from October, it's not about this gallery, does just have a passing reference to instructions to craftsmen about raising the zone temperature. It says access roof, raise zone temperature. So that suggests to me there might be some reason to access the roof. Is there anything else in the record that could help explain that? Well, I think the ventilation system is on the roof. But as Morgan, again, stated in his declaration, nothing about the ventilation system affects the heating. It simply removes air from the gallery. It doesn't cause the heat to circulate around the gallery. But even assuming that Morgan made those comments, and I think we have to assume that they're true because plaintiff says that he did, what we know is that that's not all that was required to monitor the heat. We know that Morgan also, you know, actions speak louder than words. Morgan then returned to the gallery several times. Again, plaintiff says that he saw Morgan with a handheld thermometer twice. All the work requests indicate that Morgan went out to the particular galleries where, you know, a complaint or just to do a check. Most of the work requests explain that he's going out to a particular gallery. So I don't – well, maybe we have to take his allegation that Morgan said that is true. I don't believe that we have to take that he needed to go on the roof to maintain the heating system is true. I would also point the Court to a January 24, 2014, email in which the deputy superintendent indicated that whenever the temperature was brought to her attention, she always had maintenance check it and the temperatures always remained at 68 or above. And as your – please go ahead. As Your Honor pointed out, there's no medical evidence. Plaintiff saw medical staff at Southport between October of 2013 and March of 2014 more than 20 times. He never once mentioned cold conditions or any cold-related illnesses. As to the roof? Yes. You said that there's – that's the vent is on the roof, which is the usual place for an HVAC system. But if the vent was covered with snow and wasn't functioning, then you'd think that the circulation of heat in the building would be impaired, wouldn't it? There's nothing on this record to suggest that the ventilation – Well, except that somebody says in order to fix this problem of cold temperatures here, I'd have to go on the roof, and I'm not about to do that. Well, but that's – it's also not true. There's another work request that references Morgan's – it references the ventilation system is in March, and Morgan fixes a belt, a fan belt. And so it's – Morgan would have fixed any problem if it was brought to his attention. He would have fixed any ventilation problem. There's nothing in the record to suggest there was anything wrong with the ventilation system, though. He simply replaced a belt in late March. So aside from plaintiff's statement that Morgan said he'd have to go on the roof, there's nothing on this record to suggest that the rooftop would have made any difference. At the very least, as to the two supervisors, they should not be found liable. They both reasonably referred all complaints to maintenance and the inmate grievance staff, and they relied on their subordinates to monitor the heat, investigate any complaints of the cold temperatures, and respond to any work requests. There's no genuine dispute here that they acted with a sufficiently culpable state of mind akin to criminal recklessness. They simply cannot show that they did not refer these complaints, that they did not have them investigated, that they did not follow through on any complaints. There's simply no allegation here regarding that. So they're thus entitled to dismissal of the Eighth Amendment claims or qualified immunity. And as to Morgan, he reasonably discharged his duties here. No reasonable maintenance worker would have understood that he was subjecting an inmate to cruel and unusual punishment by constantly monitoring the temperatures on a daily and weekly basis, by going out to the gallery twice in response to inmate work requests, by using a handheld thermometer to check the temperatures, and by reasonably discharging his duties. So he, too, is entitled to qualified immunity. We ask that you affirm. Thank you very much. Thank you. Just very briefly, everything that my friend on the other side has said is true, if it was actually 67 degrees that winter at Southport Correctional on the back half of the A-12 gallery. So if it's really 67 degrees and Morgan is monitoring it and he's looking at the thermometer and Wenderlich and Farnham are doing regular rounds and it feels it's a balmy 67 degrees, then, yes, they acted absolutely reasonably. But that needs to be determined. There is no definitive evidence one way or another as to what the temperature was. Was it, as one witness said, tundra-like conditions all winter long? Or was it a nice 67 to 68 degrees? If it was tundra-like conditions and Mr. Morgan is walking around with his thermometer and he's refusing to go up to the roof to deal with the problem, and Wenderlich and Farnham are making their regular rounds and taunting him, saying, well, you know, nobody's going to go up to the roof to deal with that until the weather gets warmer, then that is an Eighth Amendment violation and that ought to be sorted out by a jury. The evidence in this case, and Mr. Reyes says it in his declaration, is that in mid-March he hears some noise on the roof. Someone's working up there. And then for the first time in four and a half months, heat starts to come out of the vent. In the back half of the A-12 gallery, there begins to be some relief and there is operable heat there. If that is true, if the plaintiff's version of the evidence is accepted, that is an Eighth Amendment violation and it ought to go to the jury. And unless there are further questions, I thank the Court. Thank you, Mr. Serrato. Thank you both. We'll reserve decision in this case.